UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY HOPTON,<br><br>        Plaintiff,<br><br>    v.<br><br>ANDREW SAUL,<br>Commissioner of Social Security,<br><br>        Defendant. | Case No. 18-cv-05435-JSC<br><br>**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 18, 29 |

Plaintiff Timothy Hopton seeks social security benefits for mental impairments, including obsessive compulsive disorder (OCD), generalized anxiety disorder, panic disorder, major depressive disorder, and an insomnia disorder. (Administrative Record ("AR") 59.) Pursuant to 42 U.S.C. § 405(g), Plaintiff filed this lawsuit for judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying his benefits claim. Now before the Court are Plaintiff's and Defendant's Motions for Summary Judgment. (Dkt. Nos. 18, 29.) Because the Administrative Law Judge's weighing of the medical evidence and adverse credibility finding are not supported by substantial evidence, the Court GRANTS Plaintiff's motion, DENIES Defendant's cross-motion, and REMANDS for an award of benefits.

## LEGAL STANDARD

A claimant is considered "disabled" under the Social Security Act if she meets two requirements. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C § 423(d)(1)(A).  Second, the impairment or impairments must be severe enough that she is unable to do her previous work and cannot, based on her age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  To determine whether a claimant is disabled, an administrative law judge (ALJ) is required to employ a five-step sequential analysis, examining: (1) whether the claimant is engaging in "substantial gainful activity"; (2) whether the claimant has a severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual function capacity," ("RFC") the claimant can still do her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." *Molina v. Astrue,* 674 F.3d 1104, 1110 (9th Cir. 2012); *see also* 20 C.R.F. §§404.1520(a), 416.920(a).

An ALJ's "decision to deny benefits will only be disturbed if it is not supported by substantial evidence or it is based on legal error." *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks and citation omitted).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted).  "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Id.*  In other words, if the record "can reasonably support either affirming or reversing, the reviewing court may not substitute its judgment for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec.,* 740 F.3d 519, 523 (9th Cir. 2014) (internal quotation marks and citation omitted).  However, "a decision supported by substantial evidence will still be set aside if the ALJ does not apply proper legal standards." *Id.*

## BACKGROUND

### I.  Procedural Background

Plaintiff filed applications for Title II and Title XVI social security disability benefits on June 13, 2014 and August 18, 2014, respectively.  (AR 245-48, 249-57).  He alleged that the disability began on December 21, 2013.  (AR 245).  The Commissioner denied both applications initially and upon reconsideration in June 2015. (AR 142, 160).  A month later, Plaintiff filed a

request for a hearing before an ALJ. (AR 169.) In February 2017, Plaintiff appeared and testified before ALJ Michael A. Cabotaje. (AR 7.) Aside from the Plaintiff, Joel M. Greenberg, a vocational expert, also testified. (*Id.*)

In June 2017, the ALJ issued an unfavorable decision. (AR 53-68.) Plaintiff filed a request for review of the ALJ's decision, but in August 2018, the Appeals Council determined that it would not review the ALJ's findings, making the ALJ's decision final. (AR 1-6.) Plaintiff then sought review in this Court. (Dkt. No. 1.) In accordance with Civil Local Rule 16-5, the parties filed cross-motions for summary judgment (Dkt. Nos. 18, 29), which are now ready for decision without oral argument.

## II.     Administrative Record

Plaintiff was born on November 11, 1978 and resides in American Canyon, California. (AR 15.) He dropped out of high school while in the 12th grade because of panic attacks, and does not have a GED. (AR 493.) He also has a history of mental health issues in his family: both of his parents, now deceased, were frequently hospitalized due to mental health issues, and his brother suffers from schizophrenia. (*Id.*) Plaintiff alleges that he has been unable to work since December 21, 2013 because of mental impairments, including OCD, anxiety disorder, and chronic insomnia disorder. (AR 270.)

### A.     Medical Evaluations and Physician Statements[1]

#### 1.     Psychological Evaluation by Dr. John Kiefer

Dr. John Kiefer is a consultative psychologist who examined the Plaintiff twice at the Agency's request. Once on January 24, 2012, prior to the alleged onset date, and again after the onset date, on January 20, 2015. (AR 397-402, 492-497.) During the first examination, Dr. Kiefer noted that the Plaintiff was cooperative throughout the interview, and his thought processes were logical, goal-directed, and without indications of hallucinations or delusions. (AR 397-400.) Further, Dr. Kiefer found Plaintiff's intellectual functioning to be average, with an adequate fund of knowledge, able to do simple math calculations, normal concentration abilities, limited

---

[1] This Order only summarizes the medical evidence relevant to the issues raised on the parties' cross-motions for summary judgment.

judgment, some ability to do abstract thinking, and fair insight.  (AR 400-01.)  Dr. Kiefer

diagnosed Plaintiff with OCD, panic disorder with agoraphobia, rule out hypochondriasis, rule out

delusional disorder, and gave a Global Assessment of Function (GAF) score of 45.  (AR 401.)  He

concluded that the likelihood of Plaintiff's mental condition improving within the next 12 months

was poor.  (*Id.*)  Dr. Kiefer opined that the Plaintiff had a: 1) fair ability to understand, remember,

and carry out short and simple instructions; 2) poor ability to understand and remember complex

instructions; 3) fair ability to maintain attention and concentration; 4) poor ability to interact with

coworkers and accept instructions from a supervisor; 5) poor ability to sustain an ordinary routine

without special supervision; 6) poor ability to complete a normal workday/workweek at a

consistent pace without interruptions; and 7) poor ability to deal with changes in the workplace

setting.  (AR 401.)  Dr. Kiefer ended his report with the observation that the likelihood of Plaintiff

deteriorating in the work environment is high.  (AR 402.)

      Three years later, Dr. Kiefer again examined Plaintiff.  (AR 492-497.)  During this visit, as

before, Dr. Kiefer noted that Plaintiff was cooperative throughout the interview, and his thought

processes were logical, goal-directed, and without indications of hallucinations or delusions.  (AR

494.)  Similarly, Plaintiff's intellectual functioning was again found to be average, with an

adequate fund of knowledge, able to do simple math calculations, normal concentration abilities,

limited judgment and ability to do abstract thinking, and fair insight.  (AR 495.)  Dr. Kiefer

diagnosed Plaintiff with insomnia disorder, OCD, generalized anxiety disorder, dysthymia, and

rule out delusional disorder.  (AR 495-96.)  He noted that Plaintiff appeared to respond to

questions in an open and honest manner, did not appear to be exaggerating his symptoms, and was

consistent in his account.  (AR 496.)  Dr. Kiefer also wrote that the likelihood of Plaintiff's mental

condition improving in the next twelve months was poor, as Plaintiff appeared to be resistant to

treatment, specifically a sleep study.  (*Id.*)  Like the previous visit, Dr. Kiefer opined on Plaintiff's

abilities as follows: 1) good ability to understand, remember, and carry out very short and simple

instructions; 2) good ability to understand and remember complex instructions; 3) good ability to

maintain attention and concentration; 4) poor ability to interact with coworkers and accept

instructions from a supervisor; 5) poor ability to sustain an ordinary routine without special

4

supervision; 6) poor ability to complete a normal workday/workweek at a consistent pace without interruptions; and 7) poor ability to deal with changes in the workplace setting. (*Id.*) Dr. Kiefer again ended his report with the observation that the likelihood of Plaintiff deteriorating in the work environment is high. (*Id.*) Apart from some improvements in nos. 1, 2, and 3 there was no change in Plaintiff's condition in Dr. Kiefer's assessment during the two visits.

### 2. Psychological Evaluation by Dr. Judith Speed

Dr. Judith Speed is a treating psychologist who saw Plaintiff over the course of several months. (AR 701-07.) On January 6, 2017, Dr. Speed completed a "Medical Source Statement" form reflecting Plaintiff's impairments. (AR 701-05.) Out of the 20 listed categories concerning mental impairment and ability to work, Dr. Speed assessed that Plaintiff had "severe" limitations in 6 of them: 1) ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; 2) ability to make simple work-related decisions; 3) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 4) ability to respond appropriately to changes in the work setting; 5) ability to travel to unfamiliar places or to use public transportation; and 6) ability to set realistic goals or to make plans independently of others. (AR 702-03.) Severe is defined as "[a] severe limitation which precludes the individual's ability usefully to perform the designate activity or to sustain performance of the designated activity." (AR 701.)

Dr. Speed further found that under the criteria established by Social Security Rulings 85-15 and 96-9p, Plaintiff had a "substantial loss" of ability in three of the four basic work-related activities on a sustained basis, meaning a full work-week schedule of 8-hour days, 5 days a week. (AR 703-04.) Substantial loss is defined as "a substantial loss of ability to perform a basic mental activity when he or she cannot perform the particular activity in regular, competitive employment but, at best, could do so only in a sheltered work setting where special considerations and attention are provided." (AR 704.) A finding of substantial loss in any one of the activities can justify a finding of disability. (AR 703.) Specifically, according to Dr. Speed, Plaintiff had substantial loss in ability to: 1) understand, remember, and carry out simple instructions; 2) make judgments that

are commensurate with the functions of unskilled work, *i.e.*, simple work-related decisions; 3) ability to deal with changes in a routine work setting. (AR 704.) Dr. Speed did not find a substantial loss in ability to respond appropriately to supervision, co-workers and usual work situations. (*Id.*) According to Dr. Speed, her assessed limitations of Plaintiff's abilities had lasted twelve continuous months or could be expected to last for that long at the assessed severity. (*Id.*) Dr. Speed evaluated that Plaintiff's assessed limitations began in Summer 2005. (*Id.*)

In a subsequent letter dated January 20, 2017, Dr. Speed further described Plaintiff's treatment and noted the history of mental illness in Plaintiff's family. (AR 707.) Dr. Speed wrote that while Plaintiff "appears very motivated to address and alleviate the symptoms of anxiety and depression, they continue to be present at a consistent and high level, and his use of techniques [to] reduce these symptoms has, to date, minimal success at best." (AR 707.) Further, Plaintiff's prognosis is "guarded," and the "mental health issues have been present for most of [Plaintiff's] life and efforts to address and alleviate symptoms have been minimally to not all successful." (*Id.*)

### 3. Psychological Evaluation by Dr. Amy Jenks

Dr. Amy Jenks is a treating psychologist who treated the Plaintiff for OCD in 2011, before the alleged onset date. (AR 528.) In a letter dated June 29, 2016, Dr. Jenks noted that the Plaintiff "had a history of severe symptoms of OCD that had been inadequately treated." (*Id.*) Dr. Jenks wrote that the Plaintiff's "symptoms interfered significantly with his activities of daily living and his ability to obtain employment or maintain a job." Ultimately, the therapy stopped "due to lack of response to treatment." (*Id.*)

### B. ALJ Hearing

On February 8, 2017, Plaintiff appeared with his representative at a hearing before ALJ Michael A. Cabotaje in Vallejo, California. (AR 7.) Plaintiff and Joel M. Greenberg, a vocational expert, testified. (*Id.*)

### 1. Plaintiff's Testimony

Plaintiff testified that he cannot work because of frequent "issues related to anxiety and insomnia," with the latter being more chronic since last fall. (AR 15-16.) He explained that he gets overwhelmed when he is working, and the anxiety continues to build up the more he works,

especially if he is doing physical labor.  (AR 15-16.)  When he gets stimulated, he gets triggered, which "sets off feelings of panic."  (AR 16.)  The frequency of panic attacks depends on the nature of the task.  (*Id.*)  He also gets triggered by "being away from home, having to drive, sitting at a stoplight, having to be somewhere on time," and the symptoms start to "snowball in [his] body."  (*Id.*)

Further, Plaintiff testified that when his insomnia gets worse, he cannot sustain a task and feels "impaired mentally through being able to figure stuff out and problem solve and focus on the task at hand."  (AR 36-37.)  When he is sleep deprived, he feels a "devastation," and "tend[s] to obsess about the possibility of more sleep deprivation, and the feeling of sleep deprivation tends to aggravate the fear of more sleep deprivation."  (AR 39.)  He has more panic attacks if he is sleep deprived and away from home.  (AR 39.)

Since his onset date, Plaintiff has finished a vocational rehabilitation program at the Thrive Café where, on average, he worked four hours a day, two or three days a week.  (AR 17.)  He enrolled in the vocational program in the hope "to get better and try to learn to work again."  (*Id.*)  At the beginning of the program, he was "quite on the edge of . . . having panic attacks.  (*Id.*)  While with the program, he had a "peer mentor" assigned to him and sometimes he would have to suddenly leave the job and take a break because of building anxiety.  (AR 18.)  Because it was a vocational rehabilitation program, he could do so.  (*Id.*)  On average, Plaintiff would have severe anxiety or panic two times a week.  (AR 30-31.)  Towards the end of the program when his insomnia worsened, he frequently called in sick.  (*Id.*)  He described the peer mentor relationship as one where the mentor was "holding [his] hand, basically" through the program, and frequently gave him rides to work given Plaintiff's anxiety around driving and taking public transportation.  (AR 29-30.)  Besides the Thrive Café, Plaintiff also worked at a winery as a temporary worker, but that only lasted two days because of panic attacks.  (AR 19-20.)  Prior to the winery, he worked at Coca Cola, but ultimately had to quit that job as well because of "recurrent panic attacks while on the job."  (AR 32.)

When asked by the ALJ why he was not completely compliant with medication, Plaintiff explained that he "tend[s] to a lot of reading on pharmacology medications," and is wary of

medication that "could be [a] risk for making things worse long-term." (AR 23.) Plaintiff researches on the Internet, reads scientific journals, and has "accumulated basic understanding of some of the scientific technology." (AR 24.) Even though he has been advised by his therapists to read less about his medications, Plaintiff cannot fully comply because "if something is a risk to [his] health, [he] has to know," and "it's part of [his] obsessive nature" to know. (AR 35-36, 691-92.) Plaintiff reported being compliant with his medication when he worked at the Thrive Café and his previous jobs. (AR 31-32.) He also stated that he continues to try various medications with his current doctor, but "almost all of the medications have not been helpful." (AR 33.)

Because of his inability to work, Plaintiff said that he spends his time playing guitar, watching movies, and listening to music to pass the time. (AR 26.) He also started learning sewing patterns and taught himself how to make hats. (*Id.*) However, he has not made a hat in a while, and working on new patterns has been very slow without much progress "because of the difficulties in [his] life." (*Id.*) The last hat he made was in October 2015. (AR 40.) He hardly cooks and does not leave the house "very often." (AR 27.) Occasionally, he gets out and sees friends, but "it's been happening less and less." (AR 28.) He applied for MediCal and may have had assistance in filling out the paperwork. (*Id.*)

### 2. Vocational Expert's Testimony

Joel M. Greenberg, vocational expert, testified that in his current state, Plaintiff will not be able to do the jobs he has done in the past. (AR 43.) The ALJ posited the following hypothetical to Mr. Greenberg:

> Assume a hypothetical individual of the claimant's age and education and with the past jobs that you described. Further, assume that this individual is limited to work at all exertional levels but limited to performing simple, routine, repetitive tasks, could not perform work that requires a specific production rate, such as assembly line work, can deal with no more than occasional changes and activities or work setting during the workday, would require frequent supervision, never work around hazards, defines as unprotected heights and dangerous moving machinery, and limited to simple, work-related decisions.

(AR 42-43.) Upon clarification that the RFC included the need for "frequent supervision," Mr. Greenberg opined that an individual with the above RFC could not perform other work he had

identified, as a dishwasher or janitor. (AR 45-46.) He further added that with the additional condition to the hypothetical of being "off-task 15% of the time," the person would not be employable, "especially in the type of unskilled, entry-level jobs identified." (AR 46-47.)

### C. ALJ's Decision

On June 1, 2017, the ALJ issued a written decision denying Plaintiff's applications and finding that Plaintiff was not disabled within the meaning of the Social Security Act based on the testimony, evidence, and the Social Security Administration's five-step sequential evaluation process for determining disability. (AR 53-68.)

At Step One, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since his disability onset date of December 21, 2013. (AR 58.)

At Step Two, the ALJ found that Plaintiff has the following severe impairments: insomnia disorder, OCD, generalized anxiety disorder, panic disorder, and major depressive disorder. (AR 59.)

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), and 416.926). (*Id.*) For Plaintiff's mental impairments the ALJ considered listings 12.04 and 12.06. (*Id.*) The ALJ found that Plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation such that the Paragraph B criteria was not satisfied. (*Id.*) In addition, the ALJ found that Plaintiff's mental impairments did not satisfy Paragraph C criteria because the mental disorder was not "serious and persistent." (*Id.*)

Before reaching step four, the ALJ considered Plaintiff's RFC and determined that Plaintiff "has the residual functional capacity to perform medium work" as defined under 20 C.F.R. § 404.1567(c) and 416.967(c) with the following exceptions:

> [Plaintiff] is limited to performing simple, routine, repetitive tasks. Also, he cannot perform work that requires a specific production rate, such as assembly line work; he can deal with no more than occasional changes in activities or work setting during the workday; he requires occasional supervision; he can never work around hazards, defined as unprotected heights and dangerous moving machinery; and he is limited to making simple work-related decisions.

United States District Court
Northern District of California

(AR 60.)

In making his RFC determination, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements considering the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 61.) In support of his determination, the ALJ cited Plaintiff's treatment history, daily activities, the objective medical evidence, and subjective symptoms reported to treatment providers. (AR 61-67.) ALJ did not include any limitation in the RFC finding about "being off-task, having to leave the worksite, or missing two or more days of work a month" because they were "not totally supported by the record." (AR 67.)

In considering the medical evidence, the ALJ gave "little weight" to Dr. Jenks' assessment of Plaintiff's OCD because the treatment was before the alleged onset date. (AR 64.) Similarly, the ALJ gave little weight to Dr. Kiefer's first consultative examination of Plaintiff's because it pre-dated the alleged onset date and was "inconsistent with the evidence." (AR 65.) The ALJ gave "partial weight" to Dr. Kiefer's second examination and only accepted Dr. Kiefer's opinions "to the extent that they are consistent with the treating psychologist opinion of Dr. Judith Speed." (*Id.*) The ALJ also relied on Plaintiff's "ability to work at a café and work well with supervisors" as a basis for his assessment of Dr. Kiefer's opinions. (*Id.*)

Next, the ALJ gave "partial weight" to Dr. Speed's opinion of Plaintiff's abilities. (AR 66.) In support of his assessment, the ALJ cited Plaintiff's ability to "sew hats from patterns . . . do internet research, borrow books from the library, and read and understand information from peer review studies and scientific journals about pharmacology of medications," Plaintiff's participation in the rehabilitation program at Thrive Café, and applying for MediCal. (*Id.*)

At Step Four, the ALJ agreed with the vocational expert's hearing testimony that the Plaintiff is "unable to perform any past relevant work." (*Id.*) (citing 20 C.F.R. 404.1565 and 416.965.)

At Step Five, the ALJ concluded that Plaintiff was not disabled because there were jobs that exist in significant numbers in the national economy that he could perform including

1    dishwasher and cleaner II.  (AR 67-68.)  The ALJ based this determination on the vocational

2    expert's testimony and Plaintiff's residual functional capacity, age, education, and work

3    experience. (AR 68.)

**DISCUSSION**

5        Plaintiff challenges the ALJ's decision in numerous respects.  First, Plaintiff contends that

6    the ALJ's Step Three determination was in error because the ALJ failed to properly assess

7    Plaintiff's mental impairments under the Paragraph B criteria for Listings 12.04 and 12.06.

8    Second, Plaintiff asserts that the ALJ's RFC determination is not supported by substantial

9    evidence because of errors the ALJ made when weighing the medical evidence.  Third, Plaintiff

10   insists that ALJ's Step Five findings are also not supported by substantial evidence. (Dkt. No. 18

11   at 14-25.)  Because Plaintiff's arguments regarding the weighing of the medical evidence impact

12   the ALJ's alleged errors at the other steps in the sequential evaluation, the Court's analysis begins

13   there.

14       **A.      The ALJ's Weighing of the Medical Evidence**

15       In the Ninth Circuit, courts must "distinguish among the opinions of three types of

16   physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do

17   not treat the claimant (examining physicians); and (3) those who neither examine nor treat the

18   claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (as

19   amended (Apr. 9, 1996)).  A treating physician's opinion is entitled to more weight than that of an

20   examining physician, and an examining physician's opinion is entitled to more weight than that of

21   a nonexamining physician.  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  "The opinion of an

22   examining doctor, even if contradicted by another doctor, can only be rejected for specific and

23   legitimate reasons that are supported by substantial evidence in the record," and the ALJ "must

24   provide "clear and convincing" reasons for rejecting an uncontradicted opinion of an examining

25   physician.  *Lester*, 81 F.3d at 830-31.

26       "When an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate

27   reasons for crediting one medical opinion over another, he errs.  In other words, an ALJ errs when

28   he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it,

asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison v. Colvin*, 759 F.3d 995, 1012-13 (9th Cir. 2014) (internal citation omitted). In weighing medical opinions, the ALJ may consider (1) the examining relationship, (2) the treatment relationship, (3) the supportability, (4) the consistency, (5) the specialization, and (6) other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c)(5). In conducting this review, the court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017).

Plaintiff contends that the ALJ's reasons for giving little to partial weight to the opinions of examining psychiatric consultants Drs. Kiefer and Stone are neither clear or convincing, nor specific and legitimate reasons supported by substantial evidence.

### 1. Dr. John Kiefer's Consultative Assessment of the Plaintiff's Mental Impairments

Dr. Kiefer evaluated Plaintiff twice and the ALJ gave different weight to each of his opinions. In particular, the ALJ gave little weight to Dr. Kiefer's initial assessment because it predated the alleged onset date and because it was "inconsistent with the evidence as described above." (AR 65.)

The ALJ's reason for assigning little weight to Dr. Kiefer's initial assessment because it was "inconsistent with the evidence" is not sufficient. "An ALJ can satisfy the substantial evidence requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Garrison*, 759 F.3d at 1012 (internal citations and quotation marks omitted). Here, rather than doing so, the ALJ simply stated that Dr. Kiefer's assessment was "inconsistent with the evidence" previously described. (AR 65.) Up until that point in the opinion, the ALJ had summarized Plaintiff's history of medical impairments and treatments. (AR 58-65.) The ALJ erred by failing to specifically delineate why the previously described evidence

was inconsistent with Dr. Kiefer's assessment. *See Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) (holding that and ALJ errs when he "merely states that the objective factors point toward an adverse conclusion and makes no effort to relate any of these objective factors to any of the specific medical opinions and findings he rejects.").

The ALJ's second reason for rejecting Dr. Kiefer's initial opinion—that it predates the alleged onset date—does not make the ALJ's error above harmless. In support of the ALJ's conclusion that he could reject the opinion based solely on its date, the Commissioner cites *Baker v. Berryhill*, 720 F. App'x. 352 (9th Cir. 2017) (unpublished), which relies on *Carmickle v. Comm'sr, Soc. Sec. Admin.*, 533 F.3d 1155 (9th Cir. 2008). In *Carmickle*, however, the court explained that:

> the ALJ gave little weight to [the physician's] opinion because it was provided before [the plaintiff's] alleged onset of disability at a time when [the plaintiff] was working two jobs that he never indicated having trouble performing before his on-the-job injury. Medical opinions that predate the alleged onset of disability are of limited relevance. *See Fair v. Bowen*, 885 F.2d 597, 600 (9th Cir.1989). This is especially true in cases such as this where disability is allegedly caused by a discrete event. *See* SSR 83–20 (1983).

*Id.* at 1165. Thus, it was the timing of the opinion in relation to the plaintiff's actual circumstances at that time that gave the opinion limited relevance. Here, in contrast, the ALJ does not identify any circumstance that would make Dr. Kiefer's opinion—rendered a little less than two years before the alleged onset date—wholly irrelevant. Similarly, in *Fair v. Bowen*, there was an additional reason for discounting a medical opinion, beyond that it predated the alleged onset date. 885 F.2d 597, 605 (9th Cir. 1989) (The ALJ properly discounted medical opinion prior to the alleged onset date "because it was premised on [Plaintiff's] own subjective complaints, which the ALJ had already properly discounted."); *see also Burkhart v. Bowen*, 856 F.2d 1335, 1339 n.1 (9th Cir. 1988) ("The ALJ correctly rejected this evidence on the grounds that it is not probative *both* because it is prior to the relevant time period and inconclusive since the last notation was that the depression was improved.") (emphasis added).

In any event, assuming without deciding that the ALJ did not err in refusing to consider Dr. Kiefer's initial opinion, the ALJ erred in granting "partial weight" to Dr. Kiefer's subsequent

13

evaluation.  The ALJ rejected Dr. Kiefer's opinion except to the extent that his opinion was "consistent with the treating psychologist opinion of Dr. Judith Speed." (AR 65.)  The ALJ also cited that Plaintiff "work[ed] at a café and work[ed] well with supervisors" as a basis for rejecting Dr. Kiefer's opinion that Plaintiff had "poor" functional abilities in social interaction.  (*Id.*)

First, that Dr. Kiefer's opinion differed in some respect from the opinion of Dr. Speed is not in and of itself a basis for rejecting Dr. Kiefer's opinion.  Even if an examining doctor's opinion is contradicted by another doctor, it "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 830-31. Beyond the statement that he accepted Dr. Kiefer's opinion to the extent that it was consistent with Dr. Speed, the ALJ offered no other justification.  (AR 65.)  Moreover, the ALJ also did not fully accept Dr. Speed's opinion, even though it served as the basis for rejecting Dr. Kiefer's second evaluation.  (AR 66.)

The Commissioner's reliance on *Tonapetyan v. Halter*, 242 F.3d 1144 (9th Cir. 2001) in support of the ALJ's rejection of Dr. Kiefer's second opinion is not persuasive.  In *Tonapetyan*, the ALJ rejected an examining physician's opinion that the plaintiff was "totally disabled by her physical impairments" in favor of two contrary opinions—one from an examining physician and the other from a non-examining physician—that the Plaintiff was not totally disabled.  242 F.3d at 1149.  The court found the two contrary opinions constituted specific and legitimate reasons supported by substantial evidence because unlike the first examining physician whose opinion was premised on the plaintiff's subjective complaints, the latter opinions were based on an objective examination of the plaintiff.  (*Id.*)  Here, unlike in *Tonapetyan*, the record does not include such disparate opinions.  To the contrary, Drs. Kiefer and Speed mostly agreed on the extent of Plaintiff's mental impairments, with some minor disagreements on degree of severity.  (*Compare* AR 495-96 *with* AR 702-04.)  The ALJ had to do more than baldly recite that it was rejecting Dr. Kiefer's opinion to the extent it was not consistent with Dr. Speed's opinion.

Second, the ALJ's reliance on Plaintiff's part-time work at Thrive Café to discount Dr. Kiefer's opinion is not a specific and legitimate reason supported by substantial evidence. Plaintiff's position with Thrive Café was part of a rehabilitation program that allowed Plaintiff

freedoms not traditionally associated with a work setting.  (AR 17.)  The program lasted from

March 2016 to September 2016.  (AR 349.)  Plaintiff had a "peer mentor" assigned to him where

the mentor was "holding [his] hand, basically" through the program, and frequently gave him rides

to work given Plaintiff's anxiety around driving and taking public transportation.  (AR 29-30.)

Plaintiff often had to suddenly leave the job and take a break because of building anxiety.  (AR

17.)  On average, Plaintiff would have severe anxiety or panic two times a week.  (AR 30-31.)

The ALJ does not acknowledge any of these circumstances and therefore his conclusion that based

on his café work, Dr. Kiefer's opinion of "poor" social interaction function was inconsistent is

illogical and not supported by substantial evidence.

Accordingly, the ALJ failed to offer clear and convincing or specific and legitimate

reasons supported by substantial evidence for giving partial weight to Dr. Kiefer's second opinion.

### 2. Dr. Judith Speed's Assessment of Plaintiff's Mental Impairments

Plaintiff also challenges the ALJ's assignment of "partial weight" to the opinion of treating

psychologist Dr. Speed.  (AR 66.)  The ALJ found that Dr. Speed's opinion regarding Plaintiff's

mild limitations in understanding, memory, and social interaction was consistent with the record,

but that her opinion regarding Plaintiff's moderately severe or severe limitations in adaptation are

"not entirely consistent" with Plaintiff's testimony that he can: 1)"sew hats from patterns (but

stopped because he was not satisfied with how they looked);" 2) "do Internet research, borrow

books from the library, and read and understand information from peer review studies and

scientific journals about pharmacology of medications;" 3) "learn how to make coffee and work

successfully at Thrive Café, albeit part time and with flexibility as to break;" and 4) "go to benefits

offices and, without incident, successfully apply for Medical."  (AR 66.)  The ALJ further noted

that "Dr. Speed had only seen the claimant for a few months when she rendered her opinion."

(*Id.*)

The inconsistencies cited by ALJ are not substantial evidence to reject Dr. Speed's

opinion.  *See Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who

suffers from severe panic attacks, anxiety, and depression makes some improvement does not

mean that the person's impairments no longer seriously affect her ability to function in a

workplace."); *see also Kelly v. Berryhill*, 732 F. App'x 558, 561 (9th Cir. 2018) (unpublished) ("cherry-picking of the record" is impermissible.)

First, that Plaintiff has made his own hats, does Internet research, borrows books from the library, and reads about the pharmacology of medicine does not mean he does not suffer from mental health issues which would preclude him from working. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."). Plaintiff's testimony regarding making hats exemplifies this point: Plaintiff testified that he has not made a hat since October 2015 and working on new patterns has been very slow without much progress "because of the difficulties in [his] life," and not entirely because he was not satisfied with the way they looked, as the ALJ put it. (AR 26, 40, 66.)

Second, the ALJ's reliance on Plaintiff's work at the Thrive Café to discount Dr. Speed's opinion is not enough. As discussed, *supra*, Thrive Café was a rehabilitation program that allowed Plaintiff freedoms not traditionally associated with a work setting.

Third, that Plaintiff successfully applied for MediCal does not undermine Dr. Speed's finding that he has severe limitation in concentration and persistence and severe limitations in adaptation, as evidenced by his work history. (AR 17, 19-20, 22, 702-03.) As with Plaintiff's activities of daily living, the ALJ fails to explain how his one-time application for MediCal translates to the ability to perform in a work setting. *See Trevizo v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017) ("Though the ALJ repeatedly pointed to Trevizo's responsibilities caring for her young adoptive children as a reason for rejecting her disability claim, the record provides no details as to what Trevizo's regular childcare activities involved.").

Finally, that Dr. Speed only treated Plaintiff for a short period of time is not in and of itself reason to discount her opinion. *See* 20 C.F.R. § 404.1527(a)(2) ("We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)".) When a treating doctor's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of

examination, the nature and extent of the treatment relationship, supportability, and consistency with the record. *See* 20 C.F.R. § 404.1527(c)(2)–(6). The ALJ discounted Dr. Speed's opinion based on the length of the treating relationship without discussing the other relevant factors.

Plaintiff also argues that the ALJ failed to address Dr. Speed's substantial loss assessment of Plaintiff's abilities. While there is some overlap between the substantial loss assessment and the parts of Dr. Speed's opinion the ALJ did discuss, the ALJ did not specifically discuss the substantial loss assessment and offered no reason to ignore it. The Commissioner's explanation for why the ALJ did not discuss the substantial loss assessment—that it contradicted some other parts of Dr. Speed's opinion—cannot be considered as the Court is limited to evaluating ALJ's findings and reasonings. *Bray v. Commissioner of Social Security Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking.")

Accordingly, the ALJ failed to give either clear and convincing or specific and legitimate reasons supported by substantial evidence for not fully crediting Dr. Speed's treating physician opinion.

## B. The ALJ's Adverse Credibility Finding

To "determine whether a claimant's testimony regarding subjective pain or symptoms is credible," an ALJ must use a "two-step analysis." *Garrison*, 759 F.3d at 1014. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (citations omitted). "Second, if the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (citations omitted). The clear and convincing standard is "the most demanding required in Social Security cases." *Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002).

Here, the ALJ did not find that Plaintiff was malingering, but did find that "allegations of

disability asserted by the [Plaintiff] are not entirely consistent with the balance of the evidence." (AR 63.) "To discredit a claimant's symptom testimony when the claimant has provided objective medical evidence of the impairments which might reasonably produce the symptoms or pain alleged and there is no evidence of malingering, the ALJ must give 'specific, clear, and convincing reasons for rejecting' the testimony by identifying 'which testimony [the ALJ] found not credible' and explaining 'which evidence contradicted that testimony.'" *Laborin v. Berryhill*, 867 F.3d 1151, 1155 (9th Cir. 2017) (quoting *Brown–Hunter v. Colvin*, 806 F.3d 487, 489, 494 (9th Cir. 2015)). The ALJ's reasons fail to meet the standard, and the Commissioner's attempt to bolster the ALJ's reasons similarly fail.

The ALJ relied on the following "inconsistencies":

- Plaintiff's "daily activities are not consistent with a finding of disability" because he "spends his day on the computer and doing research on the Internet . . . takes short walks, plays guitar and reads . . . does some cooking and laundry" while doing "little housekeeping . . . able to shop . . . getting out of the house and spending more time with friends, as opposed to giving into anxiety and remaining at home . . . attends individual and group counseling";

- Plaintiff's ability to "work on a sewing pattern" and that he "taught himself how to make a hat";

- Plaintiff "was able to take care of his MediCal renewal paperwork despite being stressed out about it" and asked staff for help without "having a panic attack on that occasion," since renewing MediCal is "an important and consequential task" and being able to accomplish it "is not inconsistent with allegations of a disabling mental impairment";

- Plaintiff was not "fully compliant with his medications and ha[d] declined medications," while being "thorough" in his research of medication pharmacology by doing internet research and reading peer-reviewed studies and journals;

- Plaintiff's OCD "by self-report . . . does not appear to be incapacitating" and Dr. Amy Jenks' letter regarding Plaintiff's lack of response to OCD treatment is worth little weight since it "concerns the time prior to the alleged onset date."

18

(AR 63-64.)

As discussed *supra*, the first three reasons are not specific, clear, and convincing reasons for rejecting Plaintiff's mental and functional impairment claims. As for Plaintiff's non-compliance with medication, while Plaintiff has been afraid of taking certain medication at times, he does have a long history of medication compliance. The medical records from Ole Health spanning 8/19/2015 - 11/15-2016 note that Plaintiff has largely adhered to medication as prescribed. (AR 663-700.) Plaintiff also reported being compliant with his medication when he worked at the Thrive Café and his previous jobs. (AR 31-32.) He was also compliant with his medication at the time of the hearing. (AR 33.) Moreover, Plaintiff's noncompliance with medication may *itself* be a result of his medical impairments. When asked at the hearing why he sometimes does not comply with the medication, Plaintiff explained that he "tend[s] to a lot of reading on pharmacology medications," and is wary of medication that "could be [a] risk for making things worse long-term." (AR 23.) Even though he has been advised by his therapists and other medical professionals to do less research about his medications, Plaintiff cannot fully comply because "if something is a risk to [his] health, [he] has to know," and "it's part of [his] obsessive nature" to know. (AR 35-36, 691-92.) "[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (quotation marks and citations omitted).

Likewise, although the ALJ appears to reject Plaintiff's self-reports of OCD, at Step Two the ALJ found Plaintiff to be suffering from severe OCD. (AR 688, 59.) Indeed, the record supports Plaintiff's OCD: subsequent records from Ole Health show that the Plaintiff continued to be diagnosed with OCD—along with insomnia, anxiety and panic symptoms—and was referred to therapy for it. (AR 659-60.) The ALJ fails to acknowledge this internal inconsistency within his opinion.

Accordingly, the ALJ failed to provide specific, clear and convincing reasons supported by substantial evidence for discounting Plaintiff's subjective testimony regarding his mental health and functional limitations.

***

Because the ALJ's consideration of the medical evidence and adverse credibility finding are not supported by substantial evidence, the ALJ's decision cannot stand. Given this, the Court need not consider Plaintiff's additional arguments regarding the RFC, Step three, and Step five finding. The ALJ's errors here go to the heart of the disability determination and are not harmless. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) ("An error is harmless if it is inconsequential to the ultimate nondisability determination, or if the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity.") (internal quotation marks and citations omitted); *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006) ("[A] reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.").

## C. Remand

Plaintiff asks the Court to remand for immediate benefits under the credit-as-true rule. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004). However, a court may remand for an immediate award of benefits where "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020. Each part of this three-part standard must be satisfied for the court to remand for an award of benefits, id., and "[i]t is the 'unusual case' that meets this standard." *Williams v. Colvin*, No. 12-cv-6179-YGR, 2014 WL 957025, at *14 (N.D. Cal. Mar. 6, 2014) (quoting *Benecke*, 379 F.3d at 595); *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) ("where [...] an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency") (citing *Treichler*, 775 F.3d at 1105). It is only "rare circumstances that result in a direct award of benefits" and "only when the record clearly contradicted an ALJ's conclusory findings and no substantial evidence within

the record supported the reasons provided by the ALJ for denial of benefits." *Leon*, 880 F.3d at 1047.

Such rare circumstances exist here. As to the first prong, the record is fully developed. It spans more than seven hundred pages and contains treatment notes from dozens of doctor visits during the insured period as well as medical history dating back as far as 2007. Although the ALJ insisted Plaintiff's mental impairments are not disabling, the record reflects Plaintiff's ongoing mental health problems and attempts to obtain treatment. The record also reflects Plaintiff's testimony before the ALJ and his responses to questionnaires about his physical and mental limitations, and includes medical opinions of treating physician Dr. Speed, examining physician Dr. Kiefer, and other extensive health records—all of which corroborate the disabling nature of Plaintiff's impairments. In addition, the VE testified that if someone requires "frequent supervision," they would not be employable in the two unskilled jobs that the ALJ ultimately identified that the Plaintiff can do. *Compare* AR 45-46 *with* AR 68. The VE also testified that if someone would be off-task for 15 percent of an eight-hour day, they would be unemployable. (AR 46-47.) The VE's testimony is consistent with the medical opinions of Dr. Speed and Dr. Kiefer regarding Plaintiff's abilities. Dr. Speed found severe limitations in: "ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances" and "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (AR 702.) In both of his opinions, Dr. Kiefer found the Plaintiff had a poor ability to "sustain an ordinary routine without special supervision" along with a poor ability "to complete a normal workday/workweek at a consistent pace without interruptions." (AR 401, 496.)

The second and third prongs of the credit-as-true standard are also satisfied. The ALJ failed to provide legally sufficient reasons for rejecting the informed medical opinion of Plaintiff's treating physician Dr. Speed as well as the statements of her treating psychologist Dr. Kiefer, and instead, improperly gave them less weight. When credited as true, Dr. Speed and Dr. Kiefer's opinions establish that Plaintiff is disabled because the VE testified that somebody with his

limitations regarding concentration and persistence would be unemployable. (AR 45-46.) *Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) ("The touchstone for an award of benefits is the existence of a disability, not the agency's legal error."); *Trevizo v. Berryhill*, 871 F.3d 664 (9th Cir. 2017) (applying credit-as-true where: (1) ALJ failed to provide legally sufficient reasons to discredit treating doctor's opinion; (2) treating opinion was supported by evidence; (3) VE testified that an individual of similar status and impairment was unable to work full-time; and (4) plaintiff's testimony was not inconsistent with the record).

The Commissioner insists that remand for an award of benefits is improper because the record contains conflicting evidence regarding Plaintiff's alleged disability—pointing to "conflict of medical opinion evidence." (Dkt. No. 29 at 14.) However, as discussed *supra*, this argument is not supported by the record: there is no material conflict in the medical opinion evidence. "[T]he credit-as-true rule foreclose[s] the argument that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a useful purpose under the first part of credit-as-true analysis." *See Garrison*, 759 F.3d at 1021 (citing *Benecke*, 379 F.3d at 595) ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication.") In sum, there is no serious doubt based on the Court's evaluation of the record as a whole that Plaintiff is disabled within the meaning of the Social Security Act.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is GRANTED and Defendant's cross-motion is DENIED. The Court VACATES the ALJ's final decision and REMANDS for an award of benefits.

**IT IS SO ORDERED.**

Dated: February 20, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge